# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

|  |  |
|---|---|
| **LELAND HOUSE LIMITED** | Case No. 25-51190 |
| **PARTNERSHIP COMPANY,** | Chapter 11 |
|  | Hon. Maria L. Oxholm |

Debtor.
_____/

### COVER SHEET FOR DEBTOR'S MOTION FOR ENTRY OF
### INTERIM AND FINAL ORDERS AUTHORIZING POST-PETITION
### SECURED FINANCING, GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND
### PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS
### 364(c)(1) AND 364(d)(1), AUTHORIZING ADEQUATE PROTECTION AND
### SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The Debtor has filed a motion to authorize post-petition financing, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the Debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | _____ Yes<br><br>__X___ No | Page ____, ¶ ____ |
| (5) Provisions that prime any lien without that lienholder's consent. | ___X__ Yes<br><br>_____ No | Pages _5-8_, ¶ _8__ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | ___X__ Yes<br><br>_____ No | Page _8-9_, ¶ 10(c)<br>Page _9__, ¶ _12__ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | ___X__ Yes<br><br>_____ No | Page _8__, ¶ _8(f)_ |
| (8) Provisions for the payment of prepetition debt. | __X___ Yes<br><br>_____ No | Page _8__, ¶ _9__ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br>__X__ No | Page ____, ¶ ____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (16) Provisions that purport to bind a subsequent trustee. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X___ Yes<br><br>_____ No | Page _3__, ¶ _2__<br>Page _4__, ¶ _4__ |

Respectfully submitted,

HEILMAN LAW PLLC

Dated:  December 1, 2025        By:   /s/ Ryan D. Heilman

Ryan D. Heilman (P63952)
Attorneys for Debtor
40900 Woodward Ave., Suite 100
Bloomfield, MI 48304
(248) 835-4745
ryan@heilmanlaw.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

Case No. 25-51190

**LELAND HOUSE LIMITED**
**PARTNERSHIP COMPANY,**

Chapter 11

Hon. Maria L. Oxholm

     Debtor.

_____/

**DEBTOR'S MOTION**
**FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING POST-PETITION**
**SECURED FINANCING, GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND**
**PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS 364(c)(1)**
**AND 364(d)(1), AUTHORIZING ADEQUATE PROTECTION AND**
**SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Leland House Limited Partnership Company ("Debtor") through counsel,

Heilman Law PLLC, for its Motion for Entry of Interim and Final Orders Authorizing

Debtor to Use Cash Collateral and Authorizing Adequate Protection ("Motion"), states:

**INTRODUCTION AND REQUEST FOR AN EXPEDITED HEARING**

     1.     By this Motion, Debtor seeks entry of interim and final orders under 11

U.S.C. § 364 (i) authorizing Debtor to obtain post-petition secured financing ("DIP

Loan"), (ii) grant the proposed Lender (defined below) priming liens on all Debtor's

assets with priority over all other liens, security interests and encumbrances other than

liens in favor of taxing authorities and utilities, (iii) grant the proposed Lender a

superpriority administrative expense claim with priority over all other administrative

expenses, and (iv) provide adequate protection.

2.      Debtor is required to make utility deposits to its utility providers by no later than December 4, 2025.[1] Debtor is also without casualty insurance and has insufficient cash to pay ordinary course business expenses.

3.      **Accordingly, Debtor requests that the Court schedule an interim hearing no later than Thursday December 4, 2025.**[2] Failure to timely obtain authorization to enter in the DIP Loan will result in immediate and irreparable harm. *See* Declaration, attached as Exhibit 5.

4.      Debtor understands that this Motion is being brought at the proverbial last minute and seeks a hearing on very short notice. However, Debtor has been in extended discussions both before the filing of this case and after the filing with proposed lenders. Debtor identified one lender before filing this case, which expressed high interest and confidence that it would be able to provide the requested debtor-in-possession loan. But this lender pulled out of the process with no advance warning. Debtor had also been working with a back-up proposed lender which also expressed confidence that it would be able to close on a loan within the timeframe that Debtor required, but this lender also pulled out calling the timeframe unrealistic. The current Lender, Next Bridge Funding, LLC, is not only the only lender can meet Debtor's timing requirements, but has also provided loan terms better than either of the previous two

---

[1] Immediately upon receiving the Lender's DIP Loan offer, Debtor contacted DTE Energy requesting an extension of the deadline for making the utility deposit, which was December 3, 2025. DTE Energy provided a one-day extension, which is why Debtor requests a hearing on December 4, 2025.

[2] The primary obligation driving the need for a hearing by this date is Debtor's payroll obligations.

lenders that could not close. Accordingly, Debtor now has a DIP Loan that can be closed timely and on better terms than previously proposed post-petition loans.

## JURISDICTION

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

7.      Venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

8.      On November 3, 2023 ("Petition Date"), Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code.

9.      Debtor continues to operate its business as debtor-in-possession as permitted under section §§ 1107 and 1108 of the Bankruptcy Code.[3]

10.     Debtor obtained interim authorization to use cash collateral on November 7, 2025 and final authorization on November 25, 2025. ECF Nos. 23 and 71.

### A.    Debtor's Operations.

11.     Debtor owns and operates the Leland House, a 20-story Beaux-Arts Detroit landmark built in 1927 (the "Leland House"). Debtor generates income from rents from leasing 40 units to residential tenants, commercial rent from the Leland City Club, and parking fees.

---

[3] Unless otherwise specified, statutory references in this Motion are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

3

12.     While Debtor does not expect to generate positive cash flow by continuing to operate its business, Debtor believes that shutting down operations will result in a severe depression of the value of Debtor's sole asset – the Leland House.

13.     Debtor intends to quickly undergo a sale that will permit full renovations of the Leland House and, to accomplish this, Debtor requires use of debtor-in-possession financing.

14.     As previously disclosed, Debtor's operations are not cash flow positive and Debtor requires financing to continue its business operations. Debtor further requires financing to make deposits to its utility providers, place casualty insurance, pay for repairs necessary to remedy the City of Detroit's health and safety concerns, and pay fees and expenses associated with this bankruptcy case.

15.     A proposed cash flow forecast is attached as Exhibit 6.A ("Budget"). This is the same Budget that was approved in the Final Cash Collateral Order. Because Debtor has not had financing, many of the items in the Budget designated for November will instead be paid in December, and some of the items designated for payment in December will realistically not be paid until January. Debtor will update the Budget on a monthly basis.

   **B.  Prepetition Secured Debt and Debtor's Cash Collateral.**

16.     Debtor expects that creditors will assert claims estimated in excess of $20 million secured by mortgages or liens on the Debtor's primary asset, the Leland House (the "Building").

4

17.     Based on Debtor's search of Michigan's Uniform Commercial Code (UCC) database, Debtor believes that Capital Impact Partners is the only secured creditor with an interest in Debtor's cash collateral.

18.     For purposes of complying with Local Rule 4001-2(a), a 2020 appraisal indicated the market value of the Leland House at that time to be approximately $19 million. However, due to the age of the appraisal, and lack of building repairs and rehabilitation since that time, Debtor believes the Building is likely worth less than the appraised amount, but that it still retains substantial value.

**PROPOSED DIP LOAN TERMS**

19.     The salient terms of the DIP Loan are as follows:

| DIP Lender: | Next Bridge Funding, LLC |
|---|---|
| Loan Amount: | $1,200,000. |
| Structure: | Full loan to be funded into escrow with draws to be made as necessary and, at Lender's discretion, payments to be made direct from escrow to post-petition creditors. |
| Interest Rate and Fees | Interest at 17.99%;<br>4.0 points origination ($48,000);<br>$5,500 Lender Fee ((Doc Prep, Processing, Underwriting, Property Inspection);<br>$5,000 Legal Fees;<br>Plus all costs and expenses, including all legal fees, in the event of default or any request for an extension of maturity or additional loan funds. |

5

| | |
|---|---|
| Application of Proceeds: | In addition to payments of Lender's interest, fees and costs, Debtor is only permitted to make payments consistent with a Budget, including: Utility Deposits; Insurance premiums or the cost of insurance premium financing; Past due and current property taxes; Past due and current water/sewer bills; City of Detroit – required repairs; and Ordinary course business operations |
| Maturity Date: | Six months from Bankruptcy Court approval; due on Sale of the Property. No prepayment penalty. |
| Priority and Liens: | Superpriority administrative claim status pursuant to 11 U.S.C. § 364(c)(1). **Priming liens on the Leland House and all Debtor's assets pursuant to 11 U.S.C. § 364(d) with priority over all liens, mortgages and security interests except taxes and water/sewer liens.** |
| Professional Fees | Fees and expenses for Lender's and Debtor's professionals to be out of proceeds of Lender's collateral. |
| Events of Default: | The DIP Loan contains usual and customary events of default. In addition, Debtor must promptly commence a sale process. |
| Remedies on Event of Default: | In addition to other customary remedies, upon the occurrence and during the continuance of an Event of Default and following the giving of 5 business days' notice to counsel for the Debtors and the United States Trustee, the Lender shall have relief from the automatic stay and may foreclose on all or any portion of the Collateral and apply the proceeds thereof to the obligations, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. |

6

20.     A copy of the proposed Loan Agreement is attached as Exhibit 6.B and a copy of the proposed Promissory Note is attached as Exhibit 6.C. The Lender may (but is not required to) demand that Debtor also enter into a mortgage, security agreement, financing statement or similar document memorializing or securing the DIP Loan, so long as the terms do not conflict with this Order or the Loan Agreement; and if Lender makes any additional advances, each advance will be memorialized by a separate promissory note (collectively, "Loan Documents").

21.     The DIP Loan is to be secured by a priming lien on all Debtor's assets with priority over all pre-existing and future liens, security interests and mortgages excepting only liens on the Building in favor of taxing authorities ("Tax Liens") and utility providers ("Utility Liens"). Debtor believes the Tax Liens are in an amount of approximately $388,000 and the Utility Liens are approximately $130,000 securing water and sewer fees.

22.     The DIP Loan is also to be secured with a superpriority lien with priority over all other administrative expenses as permitted under 11 U.S.C. § 364(c)(1).

23.     Debtor will attempt to keep the financing costs to a minimum by commencing a sales process as expeditiously as possible.

## FACTUAL SUPPORT FOR RELIEF

### A.      Use of Post-Petition Financing

24.     Debtor requires post-petition financing to continue the conduct of its business, make utility deposits, place insurance, make necessary repairs and pay the costs, fees and expenses associated with this Bankruptcy Case. *See* Declaration (Exhibit 5) and Debtor's cash flow projections (Exhibit 6.A).

7

**B.** **Request for Immediate and Interim Relief**

25.     As set forth above, to avoid immediate and irreparable harm, Debtor requires the use of cash collateral by December 4, 2025 to ensure timely payment of utility deposits. Debtor will need to make other post-petition payments on or shortly after December 4, 2025. Among other things, Debtor will place insurance immediately upon receiving the post-petition financing.

26.     Debtor requests interim relief in the form of an order permitting Debtor to pay the necessary expenses for Debtor to continue its operations, place insurance and begin making necessary health and safety repairs over the next thirty days until a final order can be entered.

27.     As set forth in Debtor's cash flow forecast and the attached Declaration, Debtor requires approximately $465,000[4] in financing before the end of December. Debtor requests that the Court authorize Debtor to obtain financing on an interim basis consistent with the attached Budget with a ten percent variance in projected operating costs. Further, as full disclosure, due to Debtor's inability to obtain earlier financing, Debtor expects to lose a number of tenants and anticipates that residential rental revenues will be substantially lower than projected.

**D.** **Adequate Protection**

28.     Debtor believes that the use of the DIP Loan to place insurance, make utility deposits, make Building repairs, and make ordinary course expenses will benefit all creditors. Creditors that have had any contact with Debtor throughout this bankruptcy

---

[4] Debtor intends to request authorization to obtain insurance premium financing to assist in placing casualty insurance. This number includes the full amount of the insurance premiums, estimated at $285,000.

case have supported Debtor obtaining post-petition financing and commencing a sale process. Accordingly, Debtor believes that the proposed use of the DIP Loan itself constitutes adequate protection.

29.    Debtor will also (i) keep its property fully insured, (ii) grant secured creditors access to Debtor's business records on reasonable request, and (iii) otherwise timely perform all obligations of a debtor-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the orders of this Court.

## LEGAL BASIS FOR RELIEF REQUESTED

30.    If a debtor is unable to obtain unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in 11 U.S.C. § 503(b) or § 507(b). See 11 U.S.C. § 364(c)(1).

31.    If the Debtor is unable to otherwise obtain post-petition credit and there is adequate protection to the interests of lien holders, the Debtor may obtain credit by granting a senior lien on property of the estate. 11 U.S.C. § 364(d).

32.    Debtor has sought post-petition financing and had a number of interested financing companies initiate discussions with Debtor, but only the proposed Lender has been willing to proceed with the DIP Loan. Debtor is not able to obtain post-petition financing on any terms except on those terms offered by the Lender.

33.    As stated above, the proceeds of the DIP Loan will be used to place insurance, make utility deposits and continue Debtor's business so that Debtor can commence a sale process for the benefit of all creditors. Debtor believes this use of the

9

DIP Loan is, itself, adequate protection. Debtor believes that the value of Debtor's property would decrease substantially and the lack of insurance would place all secured creditors at risk if the DIP Loan is not approved.

34.     The Debtors negotiated the DIP Loan with the DIP Lenders at arm's length and pursuant to their business judgment.  Provided that this judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., *Brav v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain business); *In re Ames Department Stores*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

35.     Accordingly, Debtor submits that approval of the DIP Loan is appropriate under the circumstances.

## SCHEDULING A FINAL HEARING

36.     Debtor further respectfully requests that the Court schedule a final hearing on the Motion as contemplated by LBR 4001-2(b)(3).

**WHEREFORE**, Debtor requests that the Court enter an order (i) authorizing Debtor to entry of interim and final orders under 11 U.S.C. § 364 authorizing Debtor to obtain post-petition secured financing, (ii) authorizing Debtor to grant the proposed

Lender (defined below) priming liens on all Debtor's assets with priority over all other liens, security interests and encumbrances other than liens in favor of taxing authorities and utilities, (iii) grant the proposed Lender a superpriority administrative expense claim with priority over all other administrative expenses, and (iv) scheduling a final hearing. A proposed order scheduling a hearing on the Motion is attached as Exhibit 1.

 

Respectfully submitted,

HEILMAN LAW PLLC

Dated:  December 1, 2025      By:    /s/ Ryan D. Heilman          
                                          Ryan D. Heilman (P63952)
                                          Attorneys for Debtor
                                          40900 Woodward Ave., Suite 100
                                          Bloomfield, MI 48304
                                          (248) 835-4745
                                          ryan@heilmanlaw.com

## EXHIBIT INDEX

|  | Post-petition Financing Cover Sheet |
|---|---|
| EXHIBIT 1 | Proposed Order granting the Motion |
| EXHIBIT 2 | Notice of the Motion - copies of the Motion with all attachments, and a notice of hearing (if any) will be served as required under LBR 4001-2(d) upon the earlier of (i) entry of an order scheduling a hearing on the motion on an expedited basis, (ii) 24 hours after the filing of the Motion as required under LBR 9013-1(b). A certificate of service will be filed. |
| EXHIBIT 3 | N/A |
| EXHIBIT 4 | Certificate of Service – to be filed as a separate docket entry. |
| EXHIBIT 5 | Declaration of Luis Ramirez |
| EXHIBIT 6.A | Cash Flow Projections |
| Exhibit 6.B | Loan Agreement |
| Exhibit 6.C | Promissory Note |

# EXHIBIT 1

# Proposed Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**In re:**                                                    Case No. 25-51190

**LELAND HOUSE LIMITED**                    Chapter 11
**PARTNERSHIP COMPANY,**
                                                            Hon. Maria L. Oxholm
      Debtor.

_____/

## INTERIM ORDER AUTHORIZING POST-PETITION SECURED FINANCING, GRANTING PRIORITY ADMINISTRATIVE EXPENSE AND PRIMING LIENS ON DEBTOR'S PROPERTY PURSUANT TO SECTIONS 364(c)(1), 364(c)(3), 364(d)(1), AUTHORIZING ADEQUATE PROTECTION AND SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

This matter having come before the Court upon the Debtor's First Day Motion for Entry of Interim and Final Orders Authorizing Post-Petition Secured Financing, Granting Priority Administrative Expense and Priming Liens on Debtor's Property Pursuant to Sections 364(c)(1), 364(c)(3), and 364(d)(1), Authorizing Adequate Protection, and Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 ("Motion");[1] the Court having reviewed the Motion, the Declaration in Support of the Motion and having held an interim hearing to consider the Motion; and the Court being fully advised in the premises;

**THE COURT FINDS** that:

      A.     Debtor requires post-petition financing on an emergency basis to pay utility deposits, place casualty insurance, comply with its obligations under a Consent Order[2] with the City of Detroit to make certain improvements to the Debtor's residential

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Motion.

[2] All terms not defined in this Order have the meanings set forth in the Motion.

1

real property for the health and safety of Debtor's residents, as well as to fund its necessary business expenses.

B.     Debtor will suffer irreparable harm if this Order is not entered on an interim basis. Among other things, Debtor is not able to continue in this Chapter 11 case without casualty insurance, and Debtor will not be able to continue to operate its Building if Debtor does not timely make utility deposits, in either case requiring all Debtor's tenants to vacate the Building on an expedited basis.

C.     Debtor is unable to obtain unsecured credit allowable only as an unsecured, administrative expense claim under section 503(b)(1) of the Bankruptcy Code.[3] The Debtor also is unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) or 364(c)(3) without the Debtor granting to the DIP Lender liens on Debtor's Building and personal property with priority over all other liens and mortgages (other than Tax Liens and Utility Liens) under section 364(d) and super-priority administrative expense claim status under section 503(b) of the Bankruptcy Code, in each case as provided by this Order and the DIP Loan Documents.

D.     The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

E.     It is in the best interests of the Debtor's estate that it be allowed to finance its operations and use DIP Financing under the terms and conditions set

---

[3] Unless specified otherwise, all statutory citations are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

2

forth herein and in the Budget and DIP Loan Documents.  The relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtor's estate, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Order.

F.      Based upon the record before the Court the DIP Loan Documents have been negotiated at arm's length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its estate and creditors. The DIP Lender is extending financing to the Debtors in good faith and is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

**IT IS HEREBY ORDERED** that:

1.      Debtor is authorized to enter into the DIP Financing Documents and to obtain and use the DIP Funding on an interim basis to pay the DTE Deposit, to place casualty insurance, to expend funds to comply with the Consent Order, and to pay ordinary course business costs and expenses.

2.      Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtor's performance of its obligations under the DIP Loan.

3.      Debtor is authorized to perform all obligations under the DIP Loan Documents.

4.      Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of Debtor, enforceable in

3

accordance with their terms. With respect to the Post-petition Obligations, no obligation, payment, transfer or grant of security under this Order or the other DIP Loan Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim. The Post-petition Obligations shall include all fees and expenses required under the DIP Loan Documents, including the professional fees and expenses incurred by the DIP Lender, which all shall become due upon presentation by the DIP Lender and shall become part of the DIP Loan with all the protections afforded to the DIP Loan, and shall be repaid at the same time and on the same terms that all of Debtor's other obligations under the DIP Loan shall be paid.

5.      Subject to the terms and conditions set forth in this Order and the DIP Loan Documents, Debtor is authorized to use the proceeds of the DIP Loan until the earlier to occur of: (i) the termination, acceleration or maturity of the DIP Loan as set forth in the DIP Loan Documents; or (ii) this Order or the Final Order ceases to be in full force and effect (each a "Termination Event"). The Debtor's authority to borrow under the DIP Loan shall automatically terminate on a Termination Event without further order or relief from the Court. For clarity, under the DIP Loan Documents, the DIP Lender may terminate or accelerate the DIP Loan in the event of an uncured default, dismissal of this case, conversion of this case to a case under Chapter 7 of the Bankruptcy Code, appointment of a Chapter 11 Trustee, or entry of a Final Order or any other Order of this Court that the DIP Lender believes impairs the protections provided to the DIP Lender under this Order and the DIP Loan Documents.

4

6.      Upon an event of default, which is not cured within ten days after delivery of written notice to Debtor and the United States Trustee, Lender may accelerate the DIP Loan and may exercise all rights and remedies of a secured creditor. But this provision does not provide automatic relief from the automatic stay under 11 U.S.C. § 362.

7.      All of Debtor's anticipated cash flow expenditures shall be set forth in a budget, which may be modified from time to time with consent of the DIP Lender. Debtor shall provide monthly updates to the Budget. On a monthly basis, no later than the 14th day of each month, Debtor shall provide to the DIP Lender a variance report/reconciliation relating to the Budget for the preceding month. All payments to be made by Debtor shall be made pursuant to the Budget, within a 10% permitted variance.

8.      ***Post-petition Liens***. As collateral securing the full satisfaction of the DIP Loan, the DIP Lender is hereby granted, as of the date of this Order, and without execution or recordation of filings by the Debtors of mortgages, security agreements, financing statements, or other similar documents, the following security interests and liens (collectively the "Post-petition Liens"), subject only to the Carve-out and the exclusions and exceptions expressly set forth below (all property identified in this paragraph being collectively referred to as the "DIP Collateral"):

   a. **First-position priming lien on the Building and all Debtor's other real and personal property.** Pursuant to section 364(d), a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest in and lien, which shall be senior in priority to all pre-petition and post-

5

petition security interests and liens, including the Pre-petition Liens, but not including Tax Liens and Utility Liens, upon all Debtor's real property, including the Building and all fixtures and attached property and all Debtor's personal property.

    i.   Specifically, DIP Lender's first-position priming lien shall attach to the real property commonly known as 400 Bagley Street, Detroit, MI further identified in the Motion and in the property description attached as an exhibit to the Motion.

    ii.   Specifically, DIP Lender's first-position priming lien shall attach to all Debtor's personal property whether existing on the Petition Date or thereafter acquired, including without limitation, all cash and cash collateral of Debtor, inventory, accounts receivable, other rights to payment, contracts, equipment, general intangibles, documents, instruments, interests in leaseholds, copyrights, trademarks, trade names, other intellectual property, and the proceeds of all the foregoing.

b.  **Super-priority Administrative Claims.** In addition to the Post-petition Liens granted herein, the DIP Lender shall have an allowed, super-priority, administrative expense claim under section 503(b) and section 364(c)(1) of the Bankruptcy Code (the "Super-priority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331,

6

503, 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, or

otherwise whether incurred in the Cases or any conversion thereof to a

case under chapter 7 of the Bankruptcy Code. The Super-priority Claims

shall be payable from, and have recourse to, all pre-petition and post-

petition property of the Debtors and all proceeds thereof.

c.  **Perfection.** All of the Post-petition Liens and the Super-priority Claims

are, valid, enforceable and perfected, effective as of the Petition Date, and

(notwithstanding any provisions of any agreement, instrument, document,

the Uniform Commercial Code or any other relevant law or regulation of

any jurisdiction) no further notice, filing or other act shall be required to

effect such perfection. However, the DIP Lender may, in its sole

discretion, choose to require the execution of, record and/or file (as

applicable) mortgages, financing statements, notices of liens and other

similar instruments and documents, but the execution, recordation or filing

of any such documents is not necessary for the attachment, perfection

and priority of all the Post-petition Liens and Super-priority Claims as set

forth above.

d.  **Exclusions.**  None of the Post-petition Liens or Super-priority Claims shall

include liens on or claims against causes of action under sections 502(d),

544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code, including any

proceeds of, or property and interests, unencumbered or otherwise,

recovered in respect of any of the foregoing claims and causes of action.

7

e. **First-Position Priority Exceptions.** All Post-petition Liens and Super-priority Claims granted under this Order shall be subordinate <u>only</u> to the following expenses:

    i. The Tax Liens and Utility Liens; and

    ii. Fees of the Clerk of the Bankruptcy Court and fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a).

f. **Carve-Out.** All fees and expenses of Court-approved professionals, including Debtor's professionals, to the extent allowed by the Bankruptcy Court after notice and an opportunity to object, shall be deemed funded by the DIP Loan and shall be paid out of the collateral securing the DIP Loan, but only after repayment of all amounts owed to Lender. Debtor may escrow proceeds from the sale of Lender's collateral to the extent necessary to ensure sufficient funds to pay Court-approved professionals.

9. **Payment of Tax Liens and Utility Liens.** Debtor may use the proceeds of the DIP Loan to pay all currently existing Tax Liens and Utility Liens without further order of the Court, whether or not such liens are pre-petition or post-petition liens, and whether or not the debts securing such liens arose before the Petition Date or after the Petition Date.

10. The purpose of the DIP Loan is to provide funding for Debtor through a sales process for the purpose of maximizing the sale proceeds of Debtor's property. Accordingly, the DIP Loan itself functions to preserve value and avoid loss for the benefit of all creditors. The following additional adequate protection to Debtor's creditors is approved:

8

a.  Debtor shall timely perform all obligations of a debtor-in-possession required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and the orders of this Court; and

b.  Debtor shall maintain insurance coverage for its property in accordance with the requirements of the United States Trustee; and

c.  Debtor shall proceed expeditiously towards approval of a sale process and completion of a sale of substantially all Debtor's property including Debtor's Building. Debtor shall file a motion to approve sale procedures no later than seven days after entry of this Order.

11.  Nothing in this Order shall be construed to prevent any party from filing a motion under 11 U.S.C. § 363(e) seeking different or additional Adequate Protection.

12.  Unless extended by the DIP Lender and by Order of this Court, repayment of the DIP Loan shall be due in full upon the earlier to occur of (a) a sale of the Building or any of Debtor's real property, (b) occurrence of a Termination Event, or (c) maturity of the DIP Loan.

13.  Notice of this Order shall be given by Debtor via first class mail within 24 hours of its entry under Federal Rule of Bankruptcy Procedure 4001(d) and LBR 4001-2.

14.  Objection Procedures:

a.  The deadline to file an objection to this Order is _____, 2025;

b.  The final hearing will be held as required by L.B.R. 4001-2 on _____, 2025 at__:__, _.m. (the "Hearing Date"), in person at 211 W. Fort St., Courtroom 1875, Detroit, Michigan 48226; and

c.  If no objection is timely filed, this Order may become a final order without further notice.

9

15.     Unless otherwise ordered by the Court, this Order will become a Final Order immediately after the Hearing Date if no objections are timely filed or if all objections are overruled or resolved.

16.     While this Order remains in effect and until it becomes a final order, Debtor's use of proceeds from the DIP Loan may not exceed $465,000.

17.     In the event of any conflict between this Order and any of the DIP Loan Documents, this Order shall govern.

18.     This Court will retain jurisdiction over any and all disputes arising or otherwise relating to the construction, performance, and enforcement of the terms of this Order.

10

# EXHIBIT 5

# Declaration

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**In re:**                                            Case No. 25-51190

**LELAND HOUSE LIMITED**                     Chapter 11
**PARTNERSHIP COMPANY,**

                                                      Hon. Maria L. Oxholm

       Debtor.

_____/

## DECLARATION OF LUIS RAMIREZ
### IN SUPPORT OF DEBTOR'S MOTION REQUESTING
### <u>APPROVAL OF DEBTOR-IN-POSSESSION FINANCING</u>

I, Luis Ramirez, state as follows:

1.      I am the President of Leland House Limited Partnership Company

("<u>Debtor</u>") and have been appointed as the authorized representative of Debtor in this

bankruptcy case. I am familiar with the facts and circumstances set forth in this

Declaration, and I am in all respects competent to make this Declaration in Support of

the Debtor's motion requesting approval of Debtor-in-possession financing (the

"<u>Motion</u>").[1]

2.      I am familiar with the day-to-day operations, financial affairs, and books

and records of Debtor. I am familiar with the Motion and the facts set forth therein.

Except as otherwise stated, this Declaration is based upon personal knowledge.

3.      To the best of my knowledge, information and belief, the facts set forth in

the Motion are true and correct.

---

[1] Except as otherwise stated, all capitalized terms not defined in this Declaration have the meaning ascribed to them in the First Day Motions.

1

***Background***

4.      Debtor owns and operates the Leland House, a 20-story Beaux-Arts Detroit landmark built in 1927 (the "<u>Leland House</u>"). Debtor generates income from rents from leasing 40 units to residential tenants, commercial rent from the Leland City Club, and parking fees.

***Pre-petition Indebtedness, Value and Planned Renovations***

5.      Debtor has accumulated a number of debts throughout the years secured by mortgages and/or liens on the Leland House property. Debtor estimates that creditors will assert mortgage or other liens against the Leland House property in excess of $20 million.

6.      Based on an appraisal from 2020, the Leland House property is worth approximately $19.4 million as-is, and $44 million after anticipated renovations and as-stabilized. Because the appraisal was conducted five years ago, the valuation has limited usefulness in today's building market. Given necessary repairs and a general decline in the state of the building since the appraisal was issued, and based on my discussions with potential purchasers, I believe the property has substantial value, but that the value is considerably lower than the appraised amount.

7.      Debtor's operations are not currently profitable. Debtor needs financing to continue operations in the ordinary course of business and to pay all bankruptcy-related fees and expenses.

8.      Debtor does not have casualty insurance. For Debtor to obtain casualty insurance, Debtor must obtain financing in the approximate amount of $285,000.

2

9. Debtor does not have the required funds to make deposits to its electricity and water/sewer utility providers. Debtor requires immediate financing by no later than December 4, 2025 to make these payments.

10. The cash flow projections attached to the Motion represents the Debtor's estimates of its financial requirements during the months of December, January and February. Because Debtor has not yet received post-petition financing, many of the payments listed under the November column have also not been paid – critically including utility deposits and casualty insurance.

11. Of the payments designated for December, it is critical that Debtor be permitted to meet all its ordinary course business expenses, including payroll and utility expenses, and to begin work to correct health and safety concerns identified by the City of Detroit.

12. The cash flow projections were prepared under my direction. I believe that the cash flow projections accurately estimate Debtor's cash flow needs for December through February. The cash flow projections include a projected debtor-in-possession loan that Debtor expects to obtain in the next couple of weeks, which will enable Debtor to continue operations while in bankruptcy.

13. Debtor will not be operationally profitable until Debtor has completed substantial renovations. However, if Debtor were to shut its doors immediately on an emergency basis, Debtor will not only lose all current residents and employees, but the Leland House will fall into disrepair and the value of the Leland House property will be severely depressed. It is in the best interests of Debtor and all creditors to maximize the

3

value of the Leland House property and, based on my experience, the value will be maximized by continuing operations during a refinancing or sale process.

14.     According to the cash flow projections, Debtor will need approximately $465,000 in post-petition funding on an emergency basis to continue business through the end of December (Debtor's estimated cash needs, less Debtor's expected revenue).

15.     Debtor requires this financing to place insurance, fund utility deposits, make ordinary course utility payments, and pay payroll and other ordinary course business expenses.

16.     If Debtor is not able to obtain this funding by December 4, 2025, Debtor will be unable to make the required utility deposits and the utility companies could shut-off Debtor's utilities under 11 U.S.C. § 366.

17.     Therefore, if Debtor is unable to obtain authorization to obtain funding on an interim basis by December 4, 2025, Debtor will lose electricity and Debtor, Debtor's tenants, Debtor's employees and Debtor's creditors will suffer immediate and irreparable harm.

18.     Debtor has undertaken an exhaustive search for debtor-in-possession financing. Debtor entered into discussions with seven parties interested in providing financing, including one party that had indicated before the bankruptcy was filed that they would provide financing. However, only one party has been willing to make an actual offer and Debtor has not been able to find any funding on any other terms.

19.     Accordingly, Debtor believes that the terms offered by Next Bridge Funding, LLC ("Lender") are fair and the best available loan terms.

20.    Debtor intends to commence a sales process immediately after approval of Debtor-in-possession financing. To save on financing expenses and interest, Debtor intends to expedite the sales process to fullest extent possible, subject to conferring with the United States Trustee, and all creditors in this case, and subject to approval of the Bankruptcy Court of a sales procedure.

21.    Therefore, interim and final approval of Debtor's requested post-petition financing is in the best interests of Debtor's estates and Debtor's creditors.

Dated: December 1, 2025

Luis Ramirez

Executed in Detroit, Michigan

5

# EXHIBIT 6.A

# Budget

# Cash flow forecast

| | November | December | January | February |
|---|---|---|---|---|
| Cash on hand (beginning of month) | $ 1,000 | $ 13,285 | $ 14,754 | $ 8,527 |

| Cash Receipts | November | December | January | February |
|---|---|---|---|---|
| Residential Rental Revenues (Net) | 36,224 | 36,224 | 36,224 | 36,224 |
| Parking | 13,482 | 13,482 | 13,482 | 16,500 |
| Loan proceeds | 380,000 | 85,000 | 85,000 | 25,000 |
| Commerical Income | 10,000 | 10,000 | 10,000 | 10,000 |
| Total cash receipts | $ 439,706 | $144,706 | $144,706 | $ 87,724 |

| Cash Paid Out | | | | |
|---|---|---|---|---|
| Accounting (Maddox) | - | - | - | - |
| Accounting Fees (Bookkeeping) | 500 | 500 | 500 | 500 |
| Automobile Expense | 1,114 | 1,114 | 1,114 | 1,114 |
| Bank Fees | 70 | 70 | 70 | 70 |
| Building Expenses | 1,010 | 1,190 | 1,370 | 1,550 |
| Cleaning Supplies | 1,000 | 1,000 | 1,000 | 1,000 |
| Consulting Services | - | - | - | - |
| Elevator Maintenance Contract | 270 | 270 | 270 | 270 |
| Unit Heaters for Elevator Shaft | - | 15,000 | - | - |
| Elevator Repair | - | 25,000 | 15,000 | - |
| Exterior Repairs | - | 1,500 | 1,500 | 1,500 |
| Lead Clearance | - | 6,000 | - | - |
| Fire Safety / Fire Alarm Inspection | - | 9,000 | - | - |
| Water Meter Repair | - | 12,000 | - | - |
| Gifts to employees | - | 1,500 | - | - |
| Insurance Bldg Expense | 285,175 | - | - | - |
| Internet Services | 470 | 470 | 470 | 470 |
| Legal Fees | - | - | - | - |
| Liability Insurance Expense | 5,407 | 5,407 | 5,407 | 5,407 |
| Workers Comp Ins. | 2,112 | - | - | - |
| Maintenance Supplies | 1,500 | 1,500 | 1,500 | 1,680 |
| Office Expense | 220 | 220 | 220 | 220 |
| Parking Expenses | 172 | 172 | 172 | 172 |
| Property Taxes | - | - | 58,640 | - |
| Repairs & Maintenance | 2,500 | 2,500 | 2,500 | 5,000 |
| Software & Computer | 500 | 500 | 500 | 500 |
| Gas and other expense reimbursements | 880 | 880 | 880 | |
| U - House Electric | 10,971 | 12,144 | 13,340 | 18,812 |
| U - Telephone Services | 710 | 710 | 710 | 710 |
| U - Waste Removal | 450 | 450 | 450 | 450 |
| U - Water & Sewer | 8,000 | 8,000 | 8,000 | 8,000 |
| Wages & Salaries | 36,140 | 36,140 | 36,140 | 36,140 |
| United States Trustee Fees | - | - | 1,180 | - |
| DTE Deposit | 42,840 | - | - | - |
| Water / Sewer Deposit | 24,000 | | | |
| Comcast Deposit | 1,410 | - | - | - |
| Total Cash Disbursements | $ 427,421 | $143,237 | $150,933 | $ 83,565 |
| | | | | |
| Cash Receipts minus Cash Disbursements | 12,285 | 1,469 | (6,227) | 4,159 |

# EXHIBIT 6.B

# Loan Agreement

# Loan Agreement

This Agreement (the **"Agreement"**) constitutes an agreement by and between Next Bridge Funding, LLC (including its successors and assigns, **"Lender"**), and Leland House Limited Partnership Company, a Michigan limited partnership (herein called **"Company"**), pertaining to certain loans and other credit which Lender has made or may from time to time hereafter make available to Company. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Promissory Note, dated as of the date hereof, made by Company to Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the **"Term Note"**), in respect of the term loan made to Company on the date hereof, in an aggregate principal amount of $1,200,000 (the **"Term Loan"**).

In consideration of the Obligations and all present and future loans and credit from time to time made available by Lender to or in favor of Company, and in consideration of all present and future liabilities, obligations and indebtedness of Company to Lender, howsoever created, evidenced, existing or arising, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing or arising, or due or to become due, and all extensions and/or renewals thereof (herein collectively called the **"Liabilities"**), Company covenants and agrees as follows:

1. As used in this Agreement, the following terms shall have the following respective meanings set forth below:

**"Bankruptcy Case"** means In re Leland House Limited Partnership Company, Case No. 25-51190-MLO, pending in the Bankruptcy Court.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of Michigan in which the Bankruptcy Case is pending.

**"Loan Documents"** shall mean, collectively, this Agreement, the Note, any other promissory notes evidencing other loans made by Lender to Company, and any other or document, instrument or agreement evidencing, securing or relating to this Agreement, together with any and all modifications and amendments to any of the foregoing.

**"Material Adverse Effect"** shall mean a material, adverse effect on (i) the business, property or condition (financial or otherwise) of Company; (ii) Company's ability to perform its obligations hereunder or any other Loan Document to which it is a party, or (iii) the validity or enforceability of this Agreement or any other Loan Document.

**"Organizational Documents"** shall mean, with respect to any Person, its articles of incorporation, articles of organization, bylaws, operating agreement, partnership agreement, declaration of trust or other trust agreement, or such other applicable organizational documents, including all of the exhibits thereto.

2. Each loan or other extension of credit made by Lender to or otherwise in favor of Company shall be evidenced by and subject to a promissory note or other agreement or evidence of indebtedness acceptable to Lender, and executed and delivered by Company unto Lender. All loans from Lender to Company shall be on the terms set forth in the attached Exhibit A.

3.      Company represents and warrants to Lender, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and thereafter, so long as any Liabilities remain unpaid and outstanding:

(a)     <u>Organization and Existence</u>.

(i)     Company is (i) duly organized, validly existing and in good standing as a corporation, general partnership, limited partnership or limited liability company, as applicable, under the laws of the state in which it is incorporated, organized, or formed; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) subject to Bankruptcy Court approval, has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents;

(b)     <u>Due Authorization</u>.

(i)     Subject only to Bankruptcy Court approval, the execution and delivery by Company of this Agreement and the other Loan Documents to which Company is a party, the performance by Company of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly authorized by all necessary action on the part of Company, and do not and will not (i) contravene any provision of its Organizational Documents; (ii) violate or contravene any provision of any law, rule or regulation (including, without limitation, the Regulations of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official binding on it; or (iii) require any waivers, consents or approvals by any of its creditors or trustees for its creditors.

(ii)    Except as to Bankruptcy Court approval, no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required under any provision of any applicable law for (i) Company's execution and delivery of this Agreement and the other Loan Documents to which it is a party or Company's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement, or (ii) the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

(c)     <u>Material Adverse Effect</u>. All actions, suits or proceedings pending or, to the actual knowledge of Company, threatened against Company are stayed by the automatic

stay under 11 U.S.C. section 362, except the proceedings by the City of Detroit regarding the health and safety of the Company's tenants.

(d) <u>Loan Documents</u>. Subject to Bankruptcy Court approval, each Loan Document to which Company is a party constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights).

(e) <u>No Default</u>. No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default. Company has no any right to rescind, cancel or terminate this Agreement or any other Loan Document.

(f) <u>Financial Statements</u>. All of the financial statements of Company delivered to Lender in connection with the transactions contemplated by the Loan Documents fairly present in all material respects the financial condition of Company as of the dates on which the same were prepared. There are no material liabilities or obligations, secured or unsecured (whether accrued, absolute or actual, contingent or otherwise), not reflected in such financial statements, which, in accordance with GAAP, should have been reflected therein. From the date of the most recent financial statements provided to Lender until the date hereof, there has been no materially adverse change in the financial condition of Company.

(g) <u>Tax Returns</u>. Company has filed all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Agreement (or has been granted extensions with respect to same), and has paid or made reasonable provision, in accordance with applicable laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits). All real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against Company have been fully disclosed in the Schedules that Company has filed with the Bankruptcy Court as part of the Bankruptcy Case, and Company owes no real property taxes or personal property taxes that have not been so disclosed.

(h) <u>Encumbrances</u>. There are no security interests in, or liens, mortgages, or other encumbrances on, any of Company's property or assets, except as disclosed in Debtor's bankruptcy schedules and Permitted Liens (as defined below).

4. Lender shall deposit the proceeds of the Loan into escrow with an escrow agent chosen by Lender. Lender will permit draws from escrow only in accordance with this Agreement and the **Budget** (as that term is defined in Company's Motion for Interim and Final Orders Authorizing Post-petition Secured Financing (**"DIP Financing Motion"**) and, at Lender's discretion, Lender may require that certain payments be made directly from by the escrow agent to any vendor or creditor of the Company.

3

5.      So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall:

(a)     Furnish to Lender, or cause to be furnished to Lender, in each case, in form and detail and on a reporting basis satisfactory to Lender, the following:

(i)     as soon as available, and in any event not later than 90 days after and as of the end of each fiscal year of Company financial statements of Company for and as of the end of each such fiscal year, containing the balance sheets of Company as of the close of each such fiscal year, statements of income and retained earnings and a statement of cash flows of Company for each such fiscal year, and such other comments and financial details as are usually included in similar reports.  Such financial statements shall be prepared in such detail as Lender may reasonably require;

(ii)    as soon as available, and in any event not later than 20 days after and as of the end of each month of each fiscal year of Company, monthly operating reports of Company filed in Company's Bankruptcy Case and containing the balance sheet of Company as of the end of each such month, statements of income and retained earning and a statement of cash flows for Company for such month and for the portion of the fiscal year of Company through the end of the month then ending, and such other comments and financial details as are usually included in similar reports. Such financial statements shall be prepared in accordance with United States Trustee guidelines, shall be in such detail as Lender may reasonably require, and shall be certified as to accuracy and fairness by the chief executive or chief financial officer of Company (or, if none exists, such other officer with similar duties and responsibilities and familiarity with Company's finances and operations);

(iii)   as soon as available, and in any event within 20 days after and as of the end of each month, agings of Company's post-bankruptcy accounts receivable and accounts payable, each in form satisfactory to Lender, certified by a duly authorized officer of Company;

(iv)    (a) within 10 days after filing, the federal income tax returns for Company, including all schedules thereto and (b) within 10 days after filing, the federal payroll tax returns for Company, including all schedules thereto;

(v)     within 20 days after and as of the end of each month of each fiscal year of Company, statements for each bank account maintained by Company; and

(vi)    promptly, at such times as Lender may reasonably require, in form and detail satisfactory to Lender, such other information and reports as may be required under the terms of any Loan Documents or as Lender may reasonably request from time to time.

4

(b) Promptly inform Lender of the occurrence of any Event of Default, or any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default (any such condition or event, a "Default"), under any of the Liabilities or Loan Documents, and of any condition or event which has had or could have a material adverse effect upon Company's business, properties, financial condition or its ability to observe, perform or comply with its liabilities and obligations hereunder or otherwise in respect of any of the Liabilities or the Loan Documents.

(c) Maintain insurance of the type and in the manner reasonably acceptable to Lender.

(d) Preserve and maintain its existence and all of its rights, franchises and privileges.

(e) Comply with all applicable laws and United States Trustee guidelines, and will promptly notify Lender in the event that Company receives any notice, claim or demand from any governmental authority asserting the violation of any applicable legal requirement which could reasonably be expected to have a material adverse effect upon Company.

(f) Obtain all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any governmental authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable law:

  (i) for the performance by Company of any of its agreements or obligations under the Term Note, this Agreement or any other Loan Document to which it is a party or for the payment by Company to Lender of any sums which shall become due and payable by it thereunder;

  (ii) to ensure the continuing legality, validity, binding effect or enforceability of the Term Note or any other Loan Document;

  (iii) to continue the proper operation of the business and operations of Company.

(g) Use the proceeds of any loans from Lender or the proceeds of any collateral securing the Liabilities only for (i) working capital, (ii) general corporate purposes, (iii) the payments of costs, fees and expenses in connection with this Agreement, the other Loan Documents, and the Consulting Engagement, and (iv) for the purposes set forth in Debtor's Budget (as that term is defined in Debtor's Motion for Interim and Final Orders Authorizing Post-petition Secured Financing (**"DIP Financing Motion"**), filed in Debtor's Bankruptcy Case.

(h) (i) Keep its assets, whether now owned or hereafter acquired, free of any lien, charge or claim (other than the (x) liens for taxes or assessments or governmental

charges or levies or utility liens that have either been disclosed in Debtor's Schedules in the Bankruptcy Case or not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by proceedings diligently pursued, (y) any other lien, encumbrance or charge existing as of the date of this loan and that is made expressly subordinate to Lender's liens and mortgage under the terms of an approved Order Authorizing Debtor to Obtain Post-petition Financing (**"DIP Financing Order"**) and (z) the liens and encumbrances arising under the Loan Documents (collectively, **"Permitted Liens"**); and (ii) not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any lien, levy, attachment or restraint to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof, or to permit the appointment of a Chapter 11 trustee, conversion of Debtor's case to a case under Chapter 7 of the Bankruptcy Code, or dismissal of the Bankruptcy Case.

(i)    (i) Obtain language in the DIP Financing Order in form and substance satisfactory to Lender providing Lender with a security interest in all funds in Debtor's bank accounts and (ii) permit Lender to have "view access" to each of its bank accounts.

(j)    Hire a chief restructuring officer or financial advisor and a real estate broker within 20 days of the date hereof, each of which shall (x) have such duties and responsibilities typical of such position and (y) receive compensation subject to approval by the Bankruptcy Court. Company's professional fees, subject to approval by the Bankruptcy Court shall be paid out of the loan proceeds.

6.    So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall not:

(a)    Modify, amend or terminate any of its Organizational Documents, or permit any of its Organizational Documents to be modified, amended or terminated, without the prior written consent of Lender. Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Default or Event of Default at the time of Company's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of any Loan Document.

(b)    Directly or indirectly (i) except in the ordinary course of business or pursuant to a sale process approved by the Bankruptcy Court, sell, transfer, lease, assign or otherwise dispose of all or any portion of its assets or any interest therein; (ii) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any lien upon or affecting its assets or any portion thereof or

6

interest therein; (iii) assign, transfer or encumber any interest of Company under this Agreement or under any other Loan Document.

(c)     Directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible, except: (i) indebtedness to Lender, (ii) Permitted Liens, (iii) other indebtedness incurred before Company commenced its Bankruptcy Case, and (iv) current unsecured trade payables and accrued liabilities arising in the ordinary course of its business.

(d)     Directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an affiliate that is not on an arms' length basis or otherwise on terms and conditions as favorable to Company as would be obtainable in a transaction with a Person that is not an affiliate or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

7.     Expenses; Taxes.

(a)     Company hereby agrees to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and Company agrees to save Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions.

(b)     Company hereby agrees to reimburse Lender, its affiliates and their respective investors, officers, directors, employees, advisors and agents for any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby or thereby, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of Lender or any person affiliated with Lender, as finally determined by a court of competent jurisdiction.

8.     Company shall pay Lender a commitment fee in an aggregate principal amount equal to 4.00% of the Term Loan, which fee shall be earned, due and payable upon the making

of the Term Loan, and paid to Lender by deducting such amount from the total Term Loan proceeds advanced to Company.

9.      (a) As a condition precedent to any and all obligations of Lender under this Loan Agreement or any other Loan Documents, and prior to any advance of funds to Company, Company must obtain Bankruptcy Court approval of this Loan Agreement through entry of the DIP Financing Order in form and substance acceptable to Lender, which includes, among other things, (i) a priming lien, security interest and mortgage on all Company's personal and real property taking priority over all other liens, security interests and mortgages except liens securing Company's real property tax obligations and obligations to utilities and (ii) a super-priority administrative expense having priority over any and all other administrative expenses in Debtor's bankruptcy case. (b) Promptly after entry of an acceptable DIP Financing Order, Company will use the proceeds to place casualty insurance, make utility deposits to ensure no utilities are shut off, and make repairs necessary to reasonably satisfy the City of Detroit's health and safety concerns. (c) Also promptly after entry of an acceptable DIP Financing Order, Company will commence a sales procedure, subject to Bankruptcy Court approval, for the purpose of selling Debtor's real property.

10.     Without in any way whatsoever limiting or affecting Lender's right to make demand for payment of all or any part of any of the Liabilities which may, at any time, be payable upon demand, Company hereby acknowledges and agrees that, in addition to any and all other provisions set forth in any of the Loan Documents relating to any Default or Event of Default thereunder, an Event of Default shall also occur under the Liabilities and the Loan Documents in the event that there shall be any change, for any reason whatsoever, in (i) the management of Company, which could, in the sole discretion and judgment of Lender, have a material adverse effect upon Company and/or its ability to pay or perform any of its liabilities or obligations in respect of the Liabilities and the Loan Documents or (ii) the ownership or control of Company.

11.     Any failure by Company to fully observe, perform or otherwise comply with any of the covenants or agreements of Company set forth in this Agreement shall constitute an Event of Default under the Liabilities and the Loan Documents, and Lender shall be entitled to exercise any and all rights and remedies available to or otherwise conferred upon Lender as a result thereof, whether by agreement, by law or otherwise.

12.     **Company hereby acknowledges and agrees that Company's compliance with the terms and conditions set forth herein, and the absence of any Default or Event of Default by Company in the observance or performance of any of the covenants or agreements of Company hereunder, shall not in any way limit, restrict or otherwise affect or impair Lender's right or ability to make demand for payment of any or all of the Liabilities which may be on a demand basis at any time in Lender's sole and absolute discretion, with or without reason or cause, and the existence of any Default or Event of Default hereunder shall not be the sole reason or basis for enabling Lender to make demand for payment of all or any part of such Liabilities.**

13.     No forbearance on the part of Lender in enforcing any of its rights or remedies under this Agreement or any other Loan Document, nor any renewal, extension or rearrangement

of any payment or covenant to be made or performed by Company hereunder or any such other Loan Document, shall constitute a waiver of any of the terms of this Agreement or such Loan Document or of any such right or remedy.

14. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan. Company irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court while the Bankruptcy Case is pending and otherwise to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Agreement, and Company irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by Company related to this Agreement or the Loan Documents may only be brought in the Bankruptcy Court or, if the Bankruptcy Case is dismissed, in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. If the Bankruptcy Case is dismissed, nothing herein shall limit the right of Lender to bring any action or proceeding against Company in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

15. Company agrees to pay to or reimburse Lender, upon demand, for all costs and expenses (including, without limitation, reasonable attorneys' fees, whether in-house or outside counsel) incurred by Lender in connection with the documentation, preparation, execution, delivery, amendment, administration and performance of this Agreement, the other Loan Documents, and otherwise in respect of the Liabilities, and the consummation and the closing of the transactions contemplated hereby or thereby, any Default or Event of Default under or in respect of any of the Liabilities or in collecting or in attempting to collect any of the Liabilities, in perfecting, maintaining or defending any of Lender's liens or security interests (or the priority thereof), if any, in any collateral securing any part of any of the Liabilities, or otherwise in enforcing any of Lender's rights or remedies under any of the Loan Documents or otherwise in respect of any of the Liabilities. Company waives any rights to assert against Lender, any defense (legal or equitable), set-off, counterclaim, or claim which Company may now or at any time hereafter have against Lender or any other party liable to Lender or that may arise, directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or any security therefor.

16. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that Company shall not assign or transfer any of its rights or obligations hereunder or otherwise in respect of any of the Liabilities without the prior written consent of Lender. Company acknowledges that Lender may, at any time, assign its rights under this Agreement and any other Loan Document, including without limitation Lender's rights to payment and enforcement of the Liabilities.

17. Company acknowledges that Lender, its investors, principals and/or affiliates may be (a) providing debt financing, equity capital or other services (including financial advisory or consulting services) to other companies in respect of which Company may have conflicting interests regarding the transactions described herein or otherwise or (b) engaged in a broad range

9

of transactions (including providing merchant cash advances or merchant consumer financing) that may involve interests that differ from the interests of Company. Without limiting the foregoing, certain providers of merchant cash advances (including providers who may have provided merchant cash advances to the Company), or their principals, may be referral sources to Lender and may also be investors in Lender or an affiliate of Lender. Company further acknowledges that neither Lender, its investors, principals and/or affiliates have any obligation to disclose such interests and transactions to Company by virtue of any fiduciary, advisory or agency relationship, and Company waives, to the fullest extent permitted by law, any actual or alleged conflict of interest, and any claims it may have against, Lender, its investors, principals and/or affiliates, for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that Lender, its investors, principals and or affiliates shall have no liability (whether direct or indirect) to Company in respect of such a conflict of interest or fiduciary duty claim, or to any person alleging a conflict of interest or asserting a fiduciary duty claim on behalf of or in right of Company, including any stockholders, employees or creditors. Company further acknowledges that Lender is not a fiduciary of Company.

18. Company hereby releases Lender and its affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters"). Without limiting the generality of the foregoing, Company hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released. Company acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. If Company asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then Company agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

19. COMPANY AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE LIABILITIES.

**Accepted and Agreed:**

**Borrower:**                                    **Lender:**
**Leland House Limited Partnership**             **Next Bridge Funding, LLC**
**Company**

By:_____                     By:_____
    Name:                         Name:
    Title:                        Title:

# EXHIBIT 6.C

# Promissory Note

# FIXED-RATE PROMISSORY NOTE

For Value Received, the undersigned, **Leland House Limited Partnership Company**, a Michigan company, ("Debtor"), promises to pay to the order of **Next Bridge Funding, LLC** or its successor or assign ("Creditor"), One Million and Two Hundred Thousand Dollars **($1,200,000)** upon the terms set forth in this fixed rate promissory note ("Note"). Interest on the unpaid principal balance shall accrue from the date of this note at the fixed rate of 17.99% per annum until maturity or Default, as later defined. Interest shall be calculated for the actual number of days the principal is outstanding on the basis of a 360-day year.

All interest and fees shall accrue and be payable in full on the Maturity Date or such other due date resulting from acceleration or sale of Borrower's assets. This Note matures on June 4, 2026 ("Maturity Date"). At maturity, Debtor shall pay in full all accrued and unpaid interest and all principal, plus any costs and fees accruing under the terms of this Note. All payments under this Note shall be in immediately available United States funds, without setoff or counterclaim.

Debtor may prepay principal and accrued interest of this Note at any time. All prepayments shall be applied first to costs and expenses due under this Note, if any, second to accrued and unpaid interest, and third to the principal balance. There shall not be any pre-payment penalty to the Debtor.

This Note shall be in default ("Default") if Debtor (i) fails to make any payments under this Note when due (including any payments due as a result of maturity or acceleration); (ii) if Debtor otherwise breaches any of the terms of this Note or any other agreement entered into between Debtor and Creditor; (iii) if Debtor ceases doing business as a going concern; or (iv) if Debtor's bankruptcy case is dismissed, converted to a case under Chapter 7 or any trustee is appointed over Debtor. Upon the occurrence of a Default, Creditor may deliver notice of the Default to Debtor. If the Default is not fully cured withing ten days after delivery of such notice, Creditor may exercise any and all remedies permitted to Creditor at law or equity, including all remedies provided in this Note, and any other agreement entered into between Debtor and Creditor, all at Creditor's sole option. Among the available remedies, Creditor may declare any or all of the indebtedness due under this Note ("Indebtedness") to be immediately due and payable. Additionally, at the Maturity Date or after a Default, Creditor may take any and all actions to collect under this Note available at law or at equity.

This Note shall bind the Debtor, and the Debtor's respective heirs, personal representatives, successors and assigns. Debtor waives presentment, demand, protest, notice of dishonor, notice of demand or intent to demand, notice of acceleration or intent to accelerate, and all other notices except the notice of Default as provided for above, and agrees that no failure to act, extension or indulgence to Debtor or release, substitution or nonenforcement of any security, whether with or without notice, shall affect the obligations of Debtor.

Debtor agrees to immediately reimburse Creditor or any other holder or owner of this Note upon demand for any and all costs and expenses (including without limit, court costs, legal expenses and attorneys' fees) incurred after Default in collecting or attempting to collect this Note or incurred in any other matter or proceeding (formal or informal, including negotiations) relating to this Note.

Debtor acknowledges and agrees that there are no contrary agreements, oral or written, modifying any provisions of this Note other than the Loan Agreement between the parties, and agrees that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Creditor expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. THIS NOTE IS MADE IN THE STATE OF MICHIGAN AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

DEBTOR AND CREDITOR ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

[Signatures on following page]

DEBTOR:

Leland House Limited Partnership
Company

By: _____
    Luis Ramirez
Its: President

Dated: December 4, 2025

Accepted:

CREDITOR:

Next Bridge Funding, LLC

By: _____

Its:

Dated: December 4, 2025