| | |
|---|---|
| In re:<br><br>LELAND HOUSE LIMITED<br>PARTNERSHIP COMPANY,<br><br>Debtor. | Case No. 25-51190<br><br>Chapter 11<br><br>Judge Maria L. Oxholm |

## OBJECTION OF THE CITY OF DETROIT TO THE DETROIT TENANTS UNION'S MOTION FOR DETERMINATION OF THE FORM AND AMOUNT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 363(E)

The City of Detroit ("**City**") objects (this "**Objection**") to the *Detroit Tenants Union's Motion for Determination of the Form and Amount of Adequate Protection Pursuant To 11 U.S.C. § 363(E)* ("**Motion**," Doc. No. 365).

The Detroit Tenants Union's ("**DTU**") Motion should be denied. No leaseholds were terminated by the sale. The tenants held month-to-month leases, terminable on 30 days' notice. On March 27, 2026, the Debtor gave termination notices and filed a motion to reject tenant leases, which motion was granted on May 29, 2026. Under Michigan law, once a lease is terminated, a tenant no longer has a cognizable property interest, even if it retains some residual right of possession. In other words, by June, when the sale occurred, there were no tenant property interests that the sale could terminate.

If the Court determines that tenant leasehold interests survived termination and rejection (which it should not), such that the sale terminated them, then the

tenant leaseholds must be valued. DTU's Motion, however, does not provide the Court with authority to help the Court determine what constitutes adequate protection of tenant interests. Instead, it makes up approaches and hopes the Court will find that one of them justifies the $16,000 per tenant the DTU seeks (coincidentally, the same amount the DTU asserts for each administrative expense claims, *see* Doc. No. 319).

"Adequate protection" compensates a party for property loss. It is not a means to redress other alleged issues, despite DTU's attempt to shoehorn all its alleged injuries into its adequate protection claim. Nor can adequate protection of one property interest be used to protect another. For example, the DTU cannot use it to recover security deposits from building sale proceeds.

A leasehold is valued at "market value"–the difference between a similar replacement lease and the current lease for the time left under the lease. Here, working from the DTU's assumptions that (1) leases averaged $650 per month (which is belied by Exhibit 6C to the Motion) and (2) replacement leases average $1,905 a month, and noting that month-to-month leases are subject to a 30-day termination notice, the tenants' property interests likely average $1,255 per lease.

That said, there is no evidentiary record for the Court to make this finding. For example, no leases have been filed with the Court and the Motion should be denied on that basis. If the Court provides additional time to allow the DTU to remedy the defects in its Motion (which it should not), however, a procedure can be

Page 2

adopted, such as the one proposed in this Objection (below), to ensure that the Court has both an evidentiary foundation and legal backing for its adequate protection determination. This is key, because any payments to tenants effectively come from other creditors. The Court likely wants (and should demand) more than unsupported statements and round figures before diverting funds from other creditors to tenants.

Further, the Debtor's monthly reports indicate that many (perhaps most) tenants were behind on their rent and thus likely in breach of their leases at the time the power in the Building (defined below) failed. It is inherently unfair to the Debtor and creditors for the Debtor to be forced to pay compensation to tenants who owed the Debtor the same amount or more in back rent.

The Motion also tries to squeeze in multiple additional arguments beyond seeking adequate protection. For instance, the DTU asks to recover security deposits from the Building's (defined below) sale proceeds. For this Motion, the Court should address only the adequate protection issue noted in the *Order Granting Debtor's Motion to Sell Real Property* ("**Sale Order**," Doc. No. 360) and decline to follow the DTU down unrelated rabbit holes.

Finally, though the DTU seeks the convenience of a consolidated procedure, it wants the door left open for tenants to seek additional adequate protection later if desired. Retroactive adequate protection cannot be granted, however. There should be no further bites at the adequate protection apple.

51133915.10/022765.00259

In short, there were no property interests to be compensated by the time the sale occurred. But, if the Court finds otherwise, it will need a procedure to properly compensate tenants for whatever interests survived, without overcompensating tenants at the expense of all other creditors, backed by a record to support that determination. In that instance, the City believes the procedure outlined herein would aid the Court in that endeavor.

### RELEVANT FACTUAL BACKGROUND

Debtor maintains property at 400 Bagley, Detroit ("**Building**"). The Building suffered a catastrophic incident on or about December 10, 2025 (the "**Event**"). As a result of the Event, the Building lost electrical service, and with it, light, water, and fire suppression, rendering it uninhabitable. The City's fire department evacuated tenants from the Building for their own safety. Subsequently, the City of Detroit Housing and Revitalization Department ("**HRD**") led a coordinated multi-departmental City effort to find tenants temporary housing and ensure that their immediate needs were met. The City also fronted the resources to restore power to the Building and get an elevator operational. The City helped tenants access the Building to reclaim their possessions and provided moving support.

On March 27, 2026, the Debtor filed its *Debtor's Motion to Reject All Month-to-Month Rental Agreements with Residential Tenants* ("**Rejection Motion**," Doc. No. 231). The Rejection Motion affirmed that the Debtor had provided termination

Page 4

notices to all tenants. *Id.*, ¶ 11; *see also* Doc. No. 330, Ex. A. It also noted that most tenant leases contained a clause allowing the Debtor to terminate the lease "[i]n the event of a happening that makes the above described premises untenable." *Id.*, ¶ 11 n.2. The Court granted the Rejection Motion on May 29, 2026 ("**Rejection Order**," Doc. No. 353), stating that the leases were "hereby rejected."

On May 1, 2026, the Debtor filed its *Debtor's Motion to Sell Real Property* ("**Sale Motion**," Doc. No. 305). The DTU objected. (Doc. No. 323.) The Court held a hearing on May 21, 2026, where it announced it would grant the Sale Motion and made other determinations. The Sale Order was entered on June 1, 2026, and the building sale closed on or around June 17, 2026.

Paragraph 45 of the Sale Order directs DTU to file a motion to determine the form and amount of adequate protection required for tenants' "interests terminated by the Sale." The DTU thus filed the Motion to which this Objection responds.

<div align="center">

**THE ASSERTIONS IN THE MOTION**

</div>

The Motion states "Courts . . . have used several overlapping methodologies" to determine adequate protection. Motion, ¶ 27. It proposes a "cost-of-termination" method (claiming it would cost $16,000 to evict each tenant, so that is what each should receive, *Id.*, ¶¶ 28-30), a "Lost Use" value method (*Id.*, ¶¶ 31-34), and a "Leasehold Value" approach (*Id.*, ¶ 35). No authority is cited for these methods.

<div align="center">

Page 5

</div>

The DTU then switches from valuing leases to discussing damages alleged under M.C.L. § 600.2918, the collateral source rule, and other topics. No cases are cited for how these relate to tenant lease values (and they don't). *Id.*, ¶¶ 36-39.

The DTU states a "uniform per-Tenant amount of $16,000 is appropriate for efficient determination of adequate protection in this proceeding." *Id.* at ¶ 48. Notably, the DTU offers no support for a $16,000 (or any) adequate protection figure. Also, the claimed efficiency is undermined by the DTU's insistence that tenants be allowed to file additional papers seeking more money. *See* ¶ 50 (claiming that an award to tenants will not prejudice any tenant's "right to seek a higher amount on individual evidence of damages in any subsequent proceeding.").

The DTU asks to surcharge Building sale proceeds to pay its adequate protection claim, notwithstanding that the Court has already found that tenants should receive adequate protection under section 363(e). *Id.* at ¶ 58. The DTU also seeks to recover lost security deposits from the Building sale proceeds, even though security deposits were not property interests in the Building. *Id.* at ¶ 59.

## **ARGUMENT**

I.    **Adequate protection is designed to protect property rights, not serve as a compensation slush fund.**

"The purpose of adequate protection is to guard a secured creditor against any decrease in the value of its collateral resulting from depreciation, destruction or the debtor's use of the collateral. The concept of adequate protection is founded on the

51133915.10/022765.00259

Fifth Amendment to the United States Constitution, and its protection of private

property interests." *Graham v. The Huntington Nat'l Bank*, 472 B.R. 444, 452

(Bankr. N.D. Ohio 2012) (citations omitted).

> Critical to a court's determination of whether a secured creditor has been offered "adequate protection" is an evaluation of what interest of the secured creditor is entitled to "adequate protection". As a constitutional minimum, it is clear that a secured creditor is **only protected to the extent of the value of the property**. *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940). *See also, Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)* 27 B.R. 1004, 10 B.C.D. 281 (Bkrtcy. 9th Cir. 1983). Consistently, under 11 U.S.C. § 506(a) a secured creditor will only have an "allowed secured claim" to the extent of the value of the collateral. The "interest in property" entitled to adequate protection under § 362(d)(1) then is the creditor's allowed secured claim. "[V]alueless junior secured positions or unsecured deficiency claims will not be entitled to adequate protection." 2 *Collier on Bankruptcy* ¶ 361.01 at 361–13 (15th ed. 1982).

*First Fed. Savs. & Loan Ass'n of Lima v. Shriver (In re Shriver)*, 33 B.R. 176, 181-

82 (Bankr. N.D. Ohio 1983) (emphasis added). Indeed, "[a]dequate protection is

required to protect an entity's interest in property. Yet, protection for the entire

bundle of rights of the entity is not required. In effect, protection is required only

for the value of an entity's interest in the property." 3 COLLIER ON BANKRUPTCY

¶ 361.02[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).

Adequate protection cannot be used to compensate for anything beyond the value of the property at issue. *Id.* (discussing *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365 (1988)); *see also In re Revco D.S., Inc.*, 901 F.2d 1359, 1365 (6th Cir. 1990) (discussing *Timbers*).

DTU cites no law that says that a creditor's damage claim is the proper amount of its adequate protection claim. This is because a creditor's damages do not change the value of collateral securing the creditor's claim. The only relevant determination is the value of the property interest to be protected. *Schriver*, 33 B.R. at 181-82. Here, that means determining the value of each tenant's leasehold interest.

## II. DTU tenants are not entitled to any adequate protection because their leases were terminated prior to the sale.

Building tenants all held month-to-month leases, which can be terminated on 30 days' notice. "Michigan has codified the common-law rule that a month-month tenancy, under an oral lease, requires a minimum of thirty days' notice of termination of either party." *Baiyewu v. Radziewicz*, No. 358857, 2022 WL 16858957, at *1 (Ct. App. Mich. Nov. 10, 2022) (quoting *Feister v Bosack*, 198 Mich. App. 19, 26 (1993) and citing M.C.L. § 554.134(1)); *Mills v. County of Lapeer*, 498 Fed. Appx. 507, 512 (6th Cir. 2012) (quoting M.C.L. § 554.134(1) and noting that "an estate at will or by sufferance may be terminated by either party giving 1 month's notice to the other party"); *Knopf v. Herta*, 212 Mich. 622, 628 (1920) ("An oral notice to

Page 8

terminate tenancy, when the payments are from month to month, an oral notice of a month, is a good and valid notice in this state[.]").

Once the 30-day period has run for a notice of termination in a month-to-month lease, if the tenant has not vacated the premises, the tenant becomes a trespasser. *Mills*, 498 Fed. Appx. at 512 (analyzing effect under Michigan law of a failure to vacate). Said differently, thirty days after receiving a termination notice, a month-to-month tenant has no "cognizable property interest" in the formerly leased property. *Id.* at 515. Without a cognizable property interest, there can be no claim for adequate protection. *Schriver*, 33 B.R. at 181-82; 3 COLLIER ON BANKRUPTCY ¶ 361.02[2].

The Debtors provided notice of termination on March 27, 2026. Rejection Motion, ¶ 11; Doc. No. 330, Ex. A. Thus, tenant leases were terminated on or around April 27, 2026. Any leases that somehow survived termination (none did) were rejected effective May 29, 2026, by the Rejection Order. Thus, after May 29, 2026, tenants lacked any "cognizable property interest" in the Building. *Mills*, 498 Fed. Appx. at 512. Under Michigan law, the value of the tenants' interest as of the June 17, 2026 sale of the Building was $0.

51133915.10/022765.00259

**III. A month-to-month leasehold interest is valued at one month's rent in a similar property, less the rent reserved by the lease.**

    **A. The value of a leasehold interest is generally the market value of a replacement lease, less the amount of rent reserved under the current lease, over the time left under the lease.**

If the leases survived the above-noted termination (which they did not), then they must be valued for adequate protection purposes. To value a leasehold interest, courts typically (a) determine the monthly fair market value of the premises, (b) deduct the actual monthly rent reserved under the lease, and then (c) carry that amount forward for the remainder of the lease term. *Great Atl. & Pac. Tea Co. v. New York*, 22 N.Y.2d 75, 84 (Ct. App. NY 1968); *see also In re Sept. 11 Litig.*, 802 F.3d 314, 329-30 (2d Cir. 2015)[1] (noting that the value of a lease tends to be "the amount that a buyer would be willing to pay for the right to assume the lessee's rights and obligations," citing *Great Atl. & Pac. Tea Co.*). "The measure of a lessee's damages for the condemnation of his leasehold interest is said to be the market value of the leasehold condemned, [that] is, the difference between the rental value of the remainder of the term and the rent reserved in the lease, or the actual value of the leasehold, where there is no market value." *Pierson v. H.R. Leonard Furniture Co.*, 268 Mich. 507, 521 (1934) (determining leasehold value in eminent

---

[1] *See also* James R. MacCrate, The Valuation of Leasehold Interests, *available at* https://realestatevaluation.wordpress.com/2010/06/02/the-valuation-of-leasehold-interests/ (discussed in *In re Sept. 11 Litig.*, 802 F.3d at 330). A copy is attached as **Exhibit 1**.

51133915.10/022765.00259

25-51190-mlo   Doc 375   Filed 07/09/26   Entered 07/09/26 16:02:22   Page 10 of 28

domain setting); *see also City of Sioux Falls v. Naused*, 88 S.D. 303, 305-06 (1974)

(South Dakota case citing and following *Pierson* and similar cases in Nebraska and

Illinois). "[I]t is the difference between the fair rental value of the leased premises

for the unexpired term of the lease and the rent reserved in the lease. Obviously, if

the fair rental value is equal to or less than the rental provided for in the lease, the

leasehold has no market value and the lessee has no compensable claim for

damages." *City of Sioux Falls*, 88 S.D. at 306 (quoting Julius L. Sackman,

*Compensation Upon the Partial Taking of a Leasehold Interest*, 1961, Institute on

Eminent Domain, 35 at 49); *see also In re Gratiot Ave., City of Detroit*, 294 Mich.

569, 574 (1940) (noting that compensation needs to factor in "the right of the owner

to terminate the tenancy by giving proper notice").

> **B.  The "time left" under a month-to-month lease is 30 days.**

As noted above, a month-to-month lease can be terminated on 30 days' notice.

*Baiyewu*, 2022 WL 16858957, at *1; *Feister*, 198 Mich. App. at 26; *Mills*, 498 Fed.

Appx. at 512; *Knopf*, 212 Mich. at 628 (1920).[2]

---

[2] Because this sharply limits the value of month-to-month leases, their value is seldom litigated. *C.f. City of Grand Rapids v. Ellis Parking Co.*, No. 159684, 1996 WL 33348760, at *2 n.4 (Ct. App. Mich. Oct. 22, 1996) ("The value of the leasehold is a distinct issue, one not raised on appeal presumably because the value of defendant's leasehold was relatively insignificant, being a month to month lease.").

51133915.10/022765.00259

**C.** **A renter may stay on after the 30-day termination notice is given and may need to be evicted, but the renter cannot demand compensation for remaining after its legal rights expire.**

After a month-to-month lease is terminated, a tenant who has not vacated the premises becomes a trespasser. *Mills*, 498 Fed. Appx. at 512. The tenant no longer has a cognizable property interest in the formerly leased property. *Id.* at 515.

**D.** **Calculation of the maximum value of each tenant's leasehold is straightforward.**

With that legal backdrop, calculating the value of a tenant's month-to-month lease is simple. Each lease's value is (1) one months' fair market rent for a similar apartment in a similar building <u>less</u> (2) the amount of rent reserved under the lease in question. The DTU asserts that one-bedroom apartments in downtown Detroit average $1,690 per month and two-bedroom apartments rent for $2,120 per month. Motion, ¶ 32. Of course, the rentals in the HUD sample would all presumably be in livable condition, whereas the units in the Building suffered from multiple code violations. Likely, Building rents were low precisely because of such issues.

Nonetheless, these figures show that a $600 month-to-month lease for a one-bedroom apartment in the Building was worth <u>at most</u> $1,090 ($1,690 fair market rent in a habitable building less $600 actual rent). A two-bedroom apartment leasing for $700 had a maximum value of $1,420 ($2,120 fair market less $700 actual).

These figures should be discounted, since the apartments used for the HUD figures were almost certainly in far better condition than anything in the Building.

51133915.10/022765.00259

But, the figures can still serve a purpose—if tenants receive these amounts, the Debtor has provided the protection required by section 363(e), and then some.

Finally, the amount of back rent owed by tenants should be considered. The Debtor's monthly operating report for the periods ending November 30, 2025 ("**Nov MOR**," Doc. No. 170) and December 31, 2025 ("**Dec MOR**," Doc. No. 171) show that many tenants, perhaps the majority, were behind at least one month in rent. *See, e.g.*, Dec MOR, p. 14 of 25 (showing tenant Pierre Smith as being $5,880 behind on rent payments). Rents owed to the estate are estate property; the Debtor would be within its rights to demand turnover of past due amounts. 11 U.S.C. §§ 541(a)(6); 542(a). Moreover, it is patently unfair for a tenant who owes rent to claim compensation ahead of other creditors.

**E. To ensure accuracy of compensation, the Debtor should file a schedule of proposed adequate protection payments.**

Having established an upper bound on adequate protection figures, the question next becomes "how does the Court ensure that each leaseholder gets the right amount?" The City proposes a simple process for the Court's consideration:

1) Within a fixed time (perhaps two weeks), the Debtor files a schedule of all leased apartments as of December 10, 2025, complete with

   a) The leased apartment number,

   b) The names of the tenants listed on the lease,

   c) The monthly rent,

   d) The number of bedrooms in the unit,

51133915.10/022765.00259

e) The fair market value for an apartment with the same number of bedrooms from the HUD exhibit listed by the DTU,

f) The amount of back rent owed on the lease (if any) as of November 30, 2025 (the last full month before the power failure), and

g) The proposed adequate protection payment for the unit (*i.e.*, fair market value less actual monthly rent less back rent owed as of November 30, 2025) to be paid jointly to the tenants named on the lease.

2) The DTU then has two weeks to object to any information on the Debtor's schedule, supporting any such objections with documentation. A hearing can be set to resolve objections if necessary.

3) After the objection period concludes and all objections are resolved, the Debtor issues the payments. Once complete, the Debtor should be deemed to have fully satisfied its adequate protection obligations to tenants.

This assures that a proper record is made taking individual tenant situations into account, provides opportunity to object, and ensures that adequate protection (as determined under Michigan law) is provided. The Court may be erring on the high side by relying on the HUD figures, given that the Building likely was in far worse condition than any building included in the HUD survey, but relying on the HUD survey ensures that at least fair compensation has been provided.

## IV. The DTU'S arguments are all unsupported, incorrect, or irrelevant.

The DTU likely disagrees with this analysis, given its fixation on $16,000 per tenant (as opposed to per lease), but it offers nothing to back up its claims. The City next addresses each of the DTU's arguments in the Motion briefly. But first, the City notes that although the Debtor has the burden of proof on adequate protection,

51133915.10/022765.00259

the DTU has the burden on the "extent of such interest."  11 U.S.C. § 363(p); *BMO Harris Bank, N.A. v. Vista Mktg. Group, Ltd. (In re Vista Mktg. Group, Ltd.)*, 548 B.R. 502, 522 (Bankr. N.D. Ill. 2016).  In other words, the DTU needs to prove the value of the leases it seeks to protect, and the Debtor needs to show that it has provided adequate protection for that value.  The DTU fails its burden.

**A.    The DTU's valuation "methodologies" all appear to be made up in an attempt to reach its desired $16,000 per tenant outcome.**

In paragraph 27, the DTU states that "Courts applying this standard in the leasehold context have used several overlapping methodologies," but does not cite a single authority where a court has applied any of its proposed methodologies.

The DTU's proposed "cost-of-termination" method (Motion, ¶¶ 28-30) suggests that the value of each lease is the Debtor's cost to evict a tenant.  This goes against Michigan law on how a leasehold interest is valued.  *E.g.*, *Pierson*, 268 Mich. at 521; *Mills*, 498 Fed. Appx. at 512.  It violates the Bankruptcy Code, as the amount sought is unrelated to the value of the property interest to be protected.  *Shriver*, 33 B.R. at 181-82; 3 COLLIER ON BANKRUPTCY ¶ 361.02[2].  Last, it simply makes no sense that a lease's value (*i.e.*, what a buyer might pay for it) would be related to eviction cost.  If anything, one would expect that the <u>higher</u> the cost of eviction, the <u>lower</u> the value of a lease—buyers will pay less for a lease if they have to incur huge legal fees to evict squatters.  The cost-of-termination approach is simply wrong.

51133915.10/022765.00259

The DTU's "Lost Use" methodology (Motion, ¶¶ 31-34) suffers similar flaws. It is unsupported by case law and there is no reason to believe that a tenant's damages control the value of its lease. The DTU attaches Tenant Information Forms to its Motion[3] purportedly to support this methodology, but they contain no information relevant for adequate protection purposes, other than the claimed rent amounts.

The DTU's "Leasehold Value" approach (Motion, ¶ 35) states the correct overall rule but ignores the Michigan Supreme Court's instruction that "the right of the owner to terminate the tenancy by giving proper notice" must be considered. *Gratiot Ave.*, 294 Mich. at 574. Month-to-month tenants have a property interest for exactly one month, not DTU's "reasonable remaining tenancy term" (Motion, ¶ 35). *Baiyewu*, 2022 WL 16858957, at *1; *Feister*, 198 Mich. App. at 26; *Mills*, 498 Fed. Appx. at 512; M.C.L. § 554.134(1); *see also Knopf*, 212 Mich. at 628. Baldly stating otherwise without support does not make it true.

**B.      The DTU does not explain how M.C.L. § 600.2918 or the Collateral Source rule applies in the context of adequate protection.**

The DTU cites to M.C.L. § 600.2918 to assert that the state of Michigan recognizes that the issues here are serious. Motion, ¶ 37. Probably so, but the DTU

---

[3] If these statements are accurate, rents are not nearly as uniform as the DTU claims. The first form shows a claimed rent of perhaps $975 a month (not very legible). Motion, p. 53 of 187. The next shows $525. *Id.*, p. 59 of 187. The third shows $550. *Id.*, p. 66 of 187. The fourth, $800, and so on. *Id.*, p. 72 of 187. It seems telling that the first four forms all fall outside of the DTU's claimed $600-700 per month range. *Id.*, ¶ 9. This is why a proper record is needed for this Court's findings.

51133915.10/022765.00259

fails to connect the dots as to how the Debtor's negligence increased the value of leases held by the DTU's tenants. That is the question before this Court, and the Debtor's conduct (or misconduct) has no bearing on it. The DTU's implication that the Debtor's acts somehow increased the value of Building leases makes no sense.

The DTU also wants to use the Collateral Source rule to bolster its claims. *Id.*, ¶ 38. But, this rule only discusses a defendant's liability, not the valuation of property interests. The City is unaware of any case law applying the Collateral Source in bankruptcy settings at all, much less adequate protection questions.

**C.    The main similarity across tenants for adequate protection purposes appears to be that each had a month-to-month lease.**

The DTU argues that each tenant was displaced under "materially identical circumstances" and thus each should get the same compensation (yet be able to seek additional compensation later). Motion, ¶¶ 47-50. Three points must be made here.

First, the DTU cannot argue for "a uniform adequate protection determination rather than individualized proceedings that would consume estate resources" (Motion, ¶ 48), yet also claim that tenants should have the "right to seek a higher amount on individualized evidence of damages in any subsequent proceeding" (Motion, ¶ 50; *see also* ¶ 34, Request for Relief F). Second bites at the apple are neither efficient nor effective. Moreover, adequate protection may not be granted "retroactively." *See Vista Mktg. Group*, 548 B.R. at 522-23. The law essentially (and correctly) is "speak now, or forever hold your peace."

51133915.10/022765.00259

Second, the best way to address the issue is to set up a process (such as the one the City proposes) which builds a simple but thorough record for each lease.

Third, and finally, adequate protection protects "interests in property"; it does not satisfy claims for damages. 11 U.S.C. § 363(e) ("[O]n request of an entity that has an **interest in property** . . . the court . . . shall . . . provide adequate protection of **such interest**.") (emphasis added); 11 U.S.C. § 361 ("When adequate protection is required under section 362, 363, or 364 of this title of an **interest of an entity in property** . . . .") (emphasis added); *United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (discussing the meaning of the phrase "interest in property"); 3 COLLIER ON BANKRUPTCY ¶ 361.02[2]. The interests here vary based on the size of the unit leased, not on the damages a tenant claims. The number of bedrooms in each apartment should be readily available from the Debtor's records. Each unit was rented month-to-month, so tenants share that similarity, but if the Court is truly going to provide adequate protection to each tenant, it cannot do so on "averages." Each lease needs to be handled individually and correctly based on its size.

### D. The DTU does not need to seek surcharge in connection with its adequate protection claim.

The DTU seeks surcharge to pay its adequate protection claim. Motion, ¶ 58. This is unnecessary. Once this Court found that there were property interests to protect, section 363(e) required conditioning the sale of the Building on protection

51133915.10/022765.00259

of those interests; surcharge is not required.  The DTU is fortunate this is true, because surcharge would be improper here.  Protection of tenants' property interests does not directly benefit other creditors with security interests in the building.  *See* 11 U.S.C. § 506(c).  Further, DTU lacks standing to seek surcharge.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 14 (2000); *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1068 (9th Cir. 2001).  The DTU does not need to (and cannot) seek surcharge for payment of tenant adequate protection claims.

**E.    The DTU cannot seek recovery of security deposits from the Building sale proceeds.**

The DTU also improperly seeks to recover tenant security deposits from the Building proceeds.  Motion, ¶ 59.  But, the security deposits do not represent a property interest in the Building and thus are not eligible for adequate protection from the Building's sale proceeds.  Security deposits were not sold under the Sale Motion nor has the Debtor sought to sell or use security deposits, so there is no proposed action under § 363 that could be "conditioned" on adequate protection of interests in security deposits.  Sections 361 and 363(e) simply do not apply.

Surcharge couldn't overcome this problem for the DTU either, even if the DTU had standing to seek surcharge (which it doesn't).  "In general, section 506(c) should not be construed as a broad authorization to charge a secured creditor's collateral with the entirety of an estate's administrative expenses.  Rather, only those

51133915.10/022765.00259

expenses that preserve, or are incurred in disposing of, the relevant collateral fall within the purview of section 506(c) . . . ." 4 COLLIER ON BANKRUPTCY ¶ 506.05[1].

This is not to say that the Debtor has no responsibility to return tenant security deposits, assuming it still has them. Of course, even though the law may require that security deposits be held in trust, it does not follow that the Debtor actually did so. If the Debtor did not segregate them in a separate account, the DTU would need to trace the security deposit funds to assert anything more than a priority unsecured claim for them. *Selby v. Ford Motor Co.*, 590 F.2d 642, 645 (6th Cir. 1979); *see also Savoy Records, Inc. v. Trafalgar Assocs. (In re Trafalgar Assocs.)*, 53 B.R. 693, 695-96 (Bankr. S.D.N.Y. 1985) (quoting COLLIER and discussing tracing of security deposits); 11 U.S.C. § 507(a)(7) (providing priority unsecured claim for deposits).

In any event, the DTU states no reason (and there isn't one) for its assertion that security deposit claims can be satisfied from Building sale proceeds.

## <u>CONCLUSION</u>

For the reasons stated above, the DTU's Motion should be denied. The Court has held that adequate protection must be provided for the valuation of each tenant's interests that were terminated by the sale of the Building. Under Michigan law, tenants no longer had a property interest in the Building by the time the sale occurred. Even if that is incorrect, the value of each month-to-month lease that survived termination is the value of one month's rent of a similarly-sized apartment

51133915.10/022765.00259

less the rent reserved under the holder's lease, not the wholly-unsupported $16,000 per tenant (rather than per leasehold interest) that the DTU seeks.

Thus, the maximum amount of adequate protection that could be awarded can be calculated using a procedure along the lines proposed by the City. If the Court is inclined to order adequate protection, a process similar to the one proposed should be adopted so that tenants are properly compensated and a proper record is developed for this Court.

<div style="margin-left:40%;">

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Ronald A. Spinner
    Marc N. Swanson (P71149)
    Ronald A. Spinner (P73198)
    150 West Jefferson, Suite 2500
    Detroit, MI  48226
    Phone: (313) 496-7829
    Fax: (313) 496-7500
    swansonm@millercanfield.com
    spinner@millercanfield.com

*Counsel for the City of Detroit*

</div>

Dated: July 9, 2026

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>LELAND HOUSE LIMITED PARTNERSHIP COMPANY,<br><br>    Debtor. | Case No. 25-51190<br><br>Chapter 11<br><br>Judge Maria L. Oxholm |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 9, 2026, he caused a copy of the

*Objection of the City of Detroit to the Detroit Tenants Union's Motion for*

*Determination of the Form Amount of Adequate Protection Pursuant to 11 U.S.C.*

*§ 363(E)* to be served via ECF upon all such parties registered for service.


By: /s/ Ronald. A. Spinner
    Marc N. Swanson (P71149)
    Ronald A. Spinner (P73198)
    150 West Jefferson, Suite 2500
    Detroit, MI 48226
    Phone: (313) 496-7829
    Fax: (313) 496-7500
    swansonm@millercanfield.com
    spinner@millercanfield.com

# EXHIBIT 1

## James R. MacCrate, The Valuation of Leasehold Interests

51133915.10/022765.00259

**Real Estate Appraisal and Valuation Issues**

*A Resource For Users of Real Estate
Appraisal Services*

---

## The Valuation of Leasehold Interests

Posted on June 2, 2010 by Jim MacCrate

# By **James R. MacCrate**, **MAI**, **CRE**, **ASA**

## Overview

The leasehold estate is the interest which a tenant or lessee acquires under a lease including rights of use and occupancy for a stated term under certain conditions (e.g., the payment of a premium and/or rent). Leasehold estates have different durations: such as, 25 years, 60 years, and 99 years, etc.  (Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed.,  2010.)  Leasehold estates present a unique and difficult assignment for real estate appraisers because there are numerous factors which can impact the valuation of the leasehold interests.  Individuals who acquire leasehold interests and lenders who finance them each take on substantial risks, either in the acquisition of or in the financing of these transactions.  In this issue, we take a look at some of the most important factors that affect the valuation of leasehold interests.

## General Valuation Methodology

The valuation of a leasehold or a sandwich leasehold position is equal to the present value of the difference between the current market rental rates and the contract rents in accordance with the lease terms over the holding period.  Ideally, comparable sales of similar interests should be analyzed.  They generally do not exist and one must compare the current market rental rate and lease terms to the contract rental rate and lease terms.  Over time, variations occur because market rents, tenant improvement costs, rental concessions and lease terms change based upon supply and demand factors.

Additional deductions are required to clearly indicate the potential cash flow to the leasehold position in the event that a specific property is subleased or a leasehold or sandwich leasehold position is sold.  These additional charges include leasing or brokerage commissions and legal or closing costs, along with any potential tenant improvement costs that currently are being paid in the marketplace.  These items affect the cash flow to the leasehold interest.  Current leases, occupancy rates, concessions and other information must be analyzed.  In addition, leasing agents must be contacted to obtain the competitive market rents for similar space in comparable locations.

**Remember, at the end of the lease, there is no residual or reversionary value to the tenant that is similar to the reversion received by the landlord's position or the leased fee estate.  They get the**

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

Close and accept

25-51190-mlo    Doc 375    Filed 07/09/26    Entered 07/09/26 16:02:22    Page 24 of 28

## Positive or Negative Leasehold Interests

Believe it or not, not all leases have a positive leasehold interest. A positive leasehold is created when the market rent is greater than the contract rent. In the current market, many leases were negotiated in 2005 through 2007 and the contract rent is higher than the current market rent creating a negative leasehold interest. Even if the leasehold interest is positive, there may be no value because the leasehold interest is not transferable to a third party. The lease agreement may prevent a transfer. There also might not be any demand. For example, in Manhattan, typical lease terms are a minimum of five years, often with options to renew. Who would want to acquire a leasehold interest that only has a remaining term of three years, unless it was for a temporary use?

Advertisement



## Market Rent Analysis

The unit of comparison for each property is, typically, the rent per square foot of space. It may be based on usable space, net rentable area, gross floor area, etc. The following represents some of the adjustment factors that should be considered in analyzing the market rent of the comparables:

- Market conditions as of the date of lease
- Vacancy and credit loss
- Location
- Corner influence
- Physical characteristics, including size and below and above grade space
- Term of lease
- Rent escalations
- Expense reimbursements
- Use restrictions
- Age and condition of the building and tenant improvements.

Leases that were negotiated in 2005 through 2007 were negotiated in a landlord's market and the current terms that are available for tenants are more favorable today. Therefore, tenants who are valuing their leasehold position may actually have a negative leasehold interest when all these factors are correctly analyzed.

A forecast is generally required to compare the expected cash flow to the leasehold position. Assumptions

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

25-51190-mlo    Doc 375    Filed 07/09/26    Entered 07/09/26 16:02:22    Page 25 of 28

potential risk, hence, the discount rate.

## Discounted Cash Flow Analysis

This approach is a set of procedures in which the quantity, variability, timing and duration of the periodic income, as well as the quantity and timing of the reversion, if any, are modeled and discounted to the present value at a specified yield rate.  Certain assumptions are critical to the analysis, such as the time required to locate a sub-tenant and rollover assumptions.  In addition, the proper discount or yield rate must be selected which represents the total expected yield to the ownership position.  The discount rate or the anticipated IRR for leasehold interests should be based on current market expectations and historical performance of similar investments, but there is no database available that provides this information or surveys that provide any benchmarks for guidance.

## Conclusion

In this limited space, it is impossible to discuss all the issues that affect the valuation of leasehold interests in real property.  We have tried to highlight some important issues to consider and point out the difficult issues that appraisers are confronted with in the valuation of leasehold interests.  This is definitely not a science, but common sense and proper analysis can produce meaningful results to protect lenders and buyers of leasehold interests. Please feel free to leave comments on this subject and point out other issues that you deem to be important when many tenants are trying to sell their leasehold interest in or sublease the space that they occupy.

**About Jim MacCrate**

Real estate appraiser and valuation consultant for more than 30 years specializing in reviewing real estate appraisals, risk management and quality control.

[View all posts by Jim MacCrate →](#)

This entry was posted in Appraisal Process, Leased Fee, Leasehold Interests, Property Rights, Retail Stores and tagged Contract Rent, discount rate, Leased Fee, Leasehold, Market Rent. Bookmark the permalink.

## 11 Responses to *The Valuation of Leasehold Interests*

**Rich** *says:*

October 18, 2011 at 11:21 pm

I was recently asked to do an appraisal where the lender wants mortgage the value of the single family home and lease the land. What is the process for determining the land's lease value if there are no land rents/leases in the subject market area?

**sanjit singh** *says:*

September 27, 2011 at 6:37 pm

Hello. Great Article. I am an AACI, P.App in Canada. I am working on Native Lease Lands, which is currently used as a Golf Resort Property. The lands (311 cabin lots ) are leased to various owners throughout the province of Alberta on a original 48

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

25-51190-mlo    Doc 375    Filed 07/09/26    Entered 07/09/26 16:02:22    Page 26 of 28

properties "Indian lands" where we can extract a "market" rent estimate. As such, I was thinking about using market rates of return on the land values to determine a rental estimate. I was first going to generate a fee simple value by using fee simple com parables. Do you have experience in this? Can anyone shed some light on how else to estimate the rental rate that the Cabin Association should pay the Native Indians? I have historical land values, historical numbers, although very old.....thanks for you help

**Jim MacCrate MAI, CRE, ASA** *says:*

September 28, 2011 at 11:05 am

The Appraisal Institute has excellet articles on estimating market rent in the LUM Library that might be useful to you. Is there a golf course on the property or are you just interested in the market rent for the land, if vacant, improved with the cabins?

Jim

**Blayne Rush** *says:*

January 25, 2011 at 2:04 pm

I have a cancer center that I am trying to value the lease hold improvements (Tenant Improvements)

The improvements cost about 1.8 million. There are two years into a 10 year lease with 2 five year renewals. We are selling the center with equipment in place. We will do a FMV in place on the equipment but any recommendations on how the tenant improvements should be valued. The buyer will take ownership of the equipment, the lease and the improvements. The potential buyer is having a 3rd party appraisal completed and I am advising the sellers.

How will (or should) the improvements be appraised?

**jmaccrate** *says:*

January 26, 2011 at 10:03 pm

I would suggest that you call a qualified designated appraiser who has experience in the valuation of special purpose properties. You can locate qualified appraisers through the Appraisal Institute or the American Society of Appraisers.

**Josh Hankins** *says:*

January 7, 2011 at 12:35 am

Great article. Extremely informative. I have a current cash flowing sandwich lease project that I'm trying to find acquisition funds for. Any suggestions where I might look?

Josh

**jmaccrate** *says:*

January 23, 2011 at 7:42 pm

I would give me call on Monday to discuss your specific situation.

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

25-51190-mlo    Doc 375    Filed 07/09/26    Entered 07/09/26 16:02:22    Page 27 of 28

**R Klipera** *says:*

June 7, 2010 at 2:07 pm

Thanks Jim, very valuable information for insurance purposes especially re evaluation of Improvements and bettterments to the property

**David Schwaner, MAI** *says:*

June 7, 2010 at 1:27 pm

Jim,

This is a great primer on a difficult valuation analysis when considering the minimal to non existant market data to support cap rates & discount rates. I would like to see comments regarding recapture of the investment when valuing improvements pursuant to a long term ground lease. I have been using a sinking fund factor for the duration of the ground lease at an estimated safe rate as an expense in the DCF.

David

> **jmaccrate** *says:*
>
> June 7, 2010 at 1:30 pm
>
> I will be very happy to address that issue in a future post.

**Stan Mullin, CRE** *says:*

June 4, 2010 at 3:02 pm

Jim,

Excellent article, The Valuation of Leasehold Interests.

Stan
http://www.stanmullin.com

**Real Estate Appraisal and Valuation Issues**

*Create a free website or blog at WordPress.com.*

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

25-51190-mlo    Doc 375    Filed 07/09/26    Entered 07/09/26 16:02:22    Page 28 of 28